2022 IL App (1st) 201217
No. 1-20-1217
Opinion filed August 22, 2022

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| EDWARD C. SNOW, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee and Cross-Appellant, | ) ) ) | No. 17 CH 13494 |
| v. | ) ) | |
| CHICAGO TRANSIT AUTHORITY, | ) ) | The Honorable Michael T. Mullen, |
| Defendant-Appellant and Cross-Appellee. | ) ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Pucinski and Coghlan concurred in the judgment and opinion.

OPINION

¶ 1     The Chicago Transit Authority (CTA) terminated the pension benefits of former employee

Edward Snow after learning he also was receiving pension benefits from Cook County and the

State for the same years of service he used to qualify for the CTA's Supplemental Retirement

Plan (Supplemental Plan or Plan). The CTA advised Snow that this "double dipping" violated

the Plan and would result in termination of his pension benefits. Snow disputed the CTA's

authority to terminate his pension and asked for a hearing. The CTA denied his request and

informed him that his benefits had ended.

¶ 2      Snow filed a petition for writ of *certiorari* seeking review of the CTA's decision to terminate his pension benefits and alleged the CTA violated his due process rights by failing to give him notice and a full evidentiary hearing. Both parties moved for summary judgment. Before ruling on the motions, the trial court ordered the CTA to hold an evidentiary hearing. After the hearing, the CTA reaffirmed ending Snow's benefits.

¶ 3      Snow again challenged the decision. The trial court entered summary judgment for the CTA on the writ of *certiorari* claim, finding (i) Snow violated the Plan's "clear and unambiguous language" by receiving benefits from two public pension plans for the same years of service and (ii) the CTA had authority to terminate Snow's benefits. But the court agreed with Snow that the CTA violated his procedural due process rights by terminating his benefits without an evidentiary hearing and awarded him damages equal to 19 months of retirement benefits he did not receive between the initial termination and the court-ordered hearing. The court also awarded attorney's fees and costs.

¶ 4      The CTA appeals the order requiring it to conduct an evidentiary hearing, the order granting summary judgment for Snow on his procedural due process claim, and the orders awarding damages, attorney's fees, and costs. Snow cross-appeals the summary judgment entered in favor of the CTA on his writ of *certiorari*.

¶ 5      We affirm in part and reverse in part. The CTA had authority to terminate Snow's benefits but violated his due process rights by failing to give him proper notice and an opportunity to be heard. Nonetheless, because Snow's damages were nominal, we reverse the award of damages and attorney's fees and costs.

¶ 6                                         Background

¶ 7        Snow began his legal career for the Illinois Department of Public Aid (IDPA). Snow made pension contributions to the State Employee Retirement System (SERS), but because he left the IDPA after one year, his SERS pension benefits never vested, and his contributions were refunded. Snow next worked for the Cook County State's Attorney for nearly 20 years. Snow participated in the Cook County Annuity and Benefit Fund (Cook County Fund) and withdrew his employee contributions when he left.

¶ 8        Snow began working as an attorney for the CTA in December 2000. He was entitled to participate in the CTA retirement plan that covered all CTA employees and was eligible to receive benefits under the CTA Supplemental Plan. The CTA board created the Supplemental Plan by ordinance to provide additional retirement benefits for professional or executive CTA employees above a specific grade level. The Supplemental Plan provided pension annuity benefits and offered retirees free health care benefits and an opportunity to purchase health care benefits for their spouses and dependents.

¶ 9        The CTA board appointed an employee retirement review committee (Retirement Committee) to administer the Supplemental Plan. Under section 5.2, the Retirement Committee could (i) make and enforce rules and regulations consistent with the Plan; (ii) decide questions arising in the administration, interpretation, and application of the Plan; and (iii) determine the eligibility of a participant to receive benefits. (The Supplemental Plan closed to new participants in 2008 with 60 participants.)

¶ 10        The 1990 Supplemental Plan, in effect when Snow began at the CTA, was amended in 2003. Then, an employee needed 10 years of service with the CTA to qualify for the Supplemental Plan. But section 8 of the 2003 amended Plan permitted employees to purchase additional service credits based on previous, continuous years of government service with

certain governmental entities, including Cook County and the State of Illinois, and apply them toward their CTA years of service. This "bridging" service helped attract experienced government employees. (A similar provision appeared in section 4 of the 1990 Plan.)

¶ 11    To prevent employees from double dipping, that is, using the same years of service to enhance more than one public pension, the Supplemental Plan reduced a participant's benefits when another government plan provided the participant with retirement benefits for the same years of service for which the participant received credit under the Supplemental Plan. Section 8.4 provided:

> "An annual Supplemental Retirement Benefit and other benefits paid to an Employee under the provisions of this Section 8 shall be reduced to the extent that any such benefits are provided by the [CTA's] Retirement Plan and any other governmental retirement plans for which the Employee received credit hereunder pursuant to the provisions of this Section 8."

¶ 12    In 2002, Snow completed two bridge of service applications seeking to use his nearly 20 years of eligible employment with the Cook County State's Attorney's Office and his year with the IDPA to qualify for the Supplemental Plan. The Retirement Committee approved both applications, subject to Snow paying additional contributions to the Supplemental Plan totaling $82,581.41 for the bridged years. After Snow made the payments, the Supplemental Plan credited Snow for his years of employment with the IDPA and Cook County and adjusted his CTA service date for calculating retirement benefits to April 16, 1980, the date he began working for IDPA. He thereby became fully vested in the Supplemental Plan, which he acknowledged he could not have done without the bridged service years, as he worked for the CTA less than five years.

¶ 13    In July 2005, Snow applied to retire from the CTA. The Retirement Committee approved his application, and Snow retired on September 1, 2005. He began receiving a fixed monthly annuity benefit of $3,849.56 based on 20.5 years of bridge of service credit and his 4.67 years of service with the CTA. In addition, Snow selected an option for his wife's benefits on his death, which was "final, binding and nonrevocable" on his retirement, and enrolled himself, his wife, and his daughter in the CTA retiree healthcare plan.

¶ 14                           Snow's Post-CTA Employment

¶ 15    On September 16, 2005, Snow began working for the Illinois Attorney General's Office. The SERS pension plan covers employees of the Attorney General's office. Under the Retirement Systems Reciprocal Act (Reciprocal Act) (40 ILCS 5/20-101 *et seq.* (West 2004)), after two years at the Attorney General's office, Snow could reestablish his retirement benefit credits in SERS for his years of service with IDPA and in the Cook County Fund for his employment with the county. To do so, Snow made $4,717.18 in contributions and interest payments to SERS and $122,580.64 in payments to the Cook County Fund. When he retired from the Attorney General's office in December 2016, Snow began receiving a monthly SERS annuity payment of $1,539.64 and a monthly Cook County Fund annuity payment of $3,404.10. Those payments were calculated using the 20.5 years of service with IDPA and Cook County and the additional 11 years he worked for the Attorney General's office after retiring from the CTA. Snow also continued receiving $3,849.56 in the CTA's retirement benefits based on the same 20.5 years of service.

¶ 16                         Plan Terminates Snow's Annuity Benefits

¶ 17    In January 2012, the Plan's attorney sent a letter to participants, including Snow, stating in part that "the Plan provides that you cannot receive credit for the same period of employment

for which you are receiving, or are eligible to receive, pension benefits under another governmental pension plan." The letter asked the recipients to "complete the enclosed affidavit and consent forms with regard to any retirement benefits that you have received or may be receiving from any other government employer." The letter closed by stating, "*Failure to respond will result in the cessation of your benefits.*" (Emphasis in original.)

¶ 18 Snow did not execute the affidavit or give the CTA permission to contact his other government employers. Instead, Snow and attorneys for the CTA exchanged numerous letters between February 2012 and May 2014 regarding the CTA's authority to modify or terminate his pension benefits. Snow contended that under section 9 of the 1990 Plan (and section 4 of the 2003 Plan), the CTA's 2003 eligibility determination and 2005 pension benefits decision were final and binding and, therefore, the CTA had no authority to modify or rescind it after he retired. The CTA asserted that under section 8.4 of the Supplemental Plan it could terminate benefits of Plan participants who engaged in "double dipping." The CTA's attorney offered to meet with Snow and a Retirement Committee representative in January 2013. Snow declined, stating that he objected to the Retirement Committee's jurisdiction and "do not wish to submit to a 'meeting' either formal or informal."

¶ 19 In December 2016, Snow notified the Plan that he intended to retire from the Attorney General's office and seek his pension from SERS and the Cook County Fund and asked for an estimate of changes in the amount of his CTA annuity. The Plan, through its then counsel, Rachel Yarch, advised Snow that section 8.4 of the Plan barred him from collecting from another pension plan for service years covered by the CTA's Plan. She asked Snow to "confirm which plan(s) [he] has elected to collect benefits from and the years of service applied so that the CTA can properly respond to your inquiry."

¶ 20    When Snow did not respond, the Retirement Committee learned through Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2016)) requests that as of January 1, 2017, the Cook County Fund was paying Snow an annuity benefit based on service credit from June 1981 through December 2000, the same years Snow used to bridge his service to obtain benefits under the Supplemental Plan. As a result, on March 22, 2017, the CTA terminated Snow's Supplemental Plan benefits, including his and his family's healthcare benefits.

¶ 21    Snow wrote Yarch disputing the CTA's interpretation of section 8.4 and again argued that the Retirement Committee lacked authority to terminate his benefits. He asked for a hearing to present evidence, testimony, and legal argument supporting his position.

¶ 22    In her response, dated March 31, 2017, Yarch informed Snow that the CTA had terminated his benefits after confirming that since January 1, 2017, he had been collecting a pension from Cook County Fund for the same service credits the Retirement Committee used to calculate his Supplemental Plan benefits, a violation of section 8.4. Yarch also informed Snow that he needed to repay the CTA for benefits received after January 1, 2017.

¶ 23    In a later letter to Snow's attorney, Yarch denied Snow's hearing request, but stated that Retirement Committee was "willing to consider any additional written materials [Snow] would like to submit by May 15, 2017." Accordingly, Snow, through his attorney, submitted a six-page letter to the Retirement Committee seeking reinstatement of his benefits. After detailing his employment history, Snow challenged the CTA's legal authority to terminate his benefits under the Reciprocal Act and section 8.4 of the Supplemental Plan and incorporated his arguments from previous letters. Snow's counsel sent a second letter a few weeks later, providing supplemental legal authority regarding his jurisdiction argument. On June 26, 2017, the Retirement Committee rejected Snow's request for reinstatement of his benefits.

¶ 24                              Circuit Court Proceedings

¶ 25      In October 2017, Snow filed a two-count verified complaint against the CTA, which he later amended, seeking reinstatement of his benefits. Count I was a petition for a writ of *certiorari*, arguing the CTA lacked authority to terminate his pension benefits because its 2005 determination was a final administrative decision that the CTA had not sought to reverse, set aside, or otherwise modify within 35 days as required by the Administrative Review Law (735 ILCS 5/3-103 (West 2020)). Count II alleged under 42 U.S.C. § 1983 that the CTA denied Snow "formal notice" and a hearing before terminating his benefits in violation of his rights to due process under the United States and Illinois Constitutions, for which he sought damages under 42 U.S.C. § 1988.

¶ 26      The parties filed cross-motions for summary judgment. After argument but without ruling on the merits of the cross-motions, the trial court ordered the CTA to conduct an evidentiary hearing on Snow's eligibility for benefits. The court stated that under the terms of the Plan, a retiree accused of a felony in the course of his CTA employment is entitled to a hearing, and "Snow should not get lesser due process rights under the Plan than a felon."

¶ 27      On remand, the Retirement Committee, through a newly formed review committee, conducted an evidentiary hearing at which Snow and Thomas McKone, the CTA's chief administrative officer and the Retirement Committee's chair, testified. At the hearing, Snow's counsel asserted that Snow's position remained unchanged between 2012 and 2017; he did not dispute the CTA's authority to continuously audit benefit eligibility but argued the Retirement Committee was required and failed to adopt rules or regulations to enforce that authority. As to Snow's due process claim, his attorney reiterated that "even though [Snow] had all these threats and notifications they were going to do this, this, if they were actually going to

effectively do that, then he should have gotten a formal notice *** [Snow] didn't have to have a big hearing like this, but he was entitled to a hearing." After considering the evidence and arguments, the review committee affirmed the Plan's March 2017 decision terminating Snow's benefits.

¶ 28    Snow then filed his second amended complaint seeking reinstatement of his benefits. Snow realleged two counts for *certiorari* and the procedural due process violation and added allegations challenging the CTA's proceedings and decision on remand. Snow asserted the Retirement Committee never adopted rules, regulations, policies, or procedures allowing it to investigate or monitor an employee's continued eligibility to receive benefits under the Supplemental Plan after retirement and lacked authority to do so and to terminate his benefits.

¶ 29    Snow again sought summary judgment, arguing he should have received "formal notice" that the Plan intended to terminate his benefits on a specific date and an evidentiary hearing before deciding to terminate his benefits. Snow sought reinstatement of his benefits or, at a minimum, an award of benefits between March 1, 2017, and September 13, 2019, the date of the Plan's decision after the court-ordered hearing. In response, the CTA renewed its arguments that its correspondence with Snow before terminating his benefits and Snow's opportunity to present evidence and arguments after termination provided constitutionally compliant notice and an opportunity to be heard.

¶ 30    On March 10, 2020, the trial court granted the CTA summary judgment on the writ of *certiorari* claim. The court stated, "I believe that based upon the information in the clear and unambiguous language of Section 8.4, Mr. Snow did, in fact, violate those provisions. Consequently, I believe it was a perfectly appropriate decision that was made by the CTA to terminate the benefits as of September 2019."

¶ 31       Nonetheless, the court granted summary judgment to Snow on his procedural due process claim. It ruled that Snow was entitled to notice of a hearing and "a full hearing" "where witnesses are able to testify, be cross-examined, exhibits are able to be introduced, and arguments are to be made." To compensate Snow for the procedural due process violation, the court awarded 19 months of retirement benefits from the CTA's initial termination in March 2017 through September 13, 2019, the date of the CTA's decision after the court-ordered hearing, which equaled about $143,000, including missed annuity benefits, healthcare benefits, and prejudgment interest.

¶ 32       The court also awarded Snow attorney's fees and costs under 42 U.S.C. § 1988. Snow submitted a fee petition. In its response, the CTA argued that the fees sought were unreasonable in relation to the ultimate damages and the parties should bear their own attorney's fees, as they were both successful on some of their claims. The CTA also petitioned for costs, asserting it was the prevailing party on the *certiorari* claim. Additionally, the CTA moved for reconsideration of the damages award, arguing that because Snow lost his eligibility for the CTA retirement benefits on January 1, 2017, he suffered no actual harm from the due process violation and was not entitled to missed pension payments for the 19 months.

¶ 33       The circuit court denied the CTA's motion to reconsider the damages award, holding that the CTA's September 13, 2019, decision confirming that Snow lost his eligibility for benefits as of January 2017 "does not mean that his benefits would have been forfeited as of a date prior to any hearing." The court also awarded Snow about $103,000 in attorney's fees and costs and denied the CTA's petition for costs.

¶ 34       The CTA argues the trial court erred in granting summary judgment for Snow on his due process violation claim and in awarding him damages and attorney's fees. Snow cross-appeals

arguing the trial court erred in denying his petition for a writ of *certiorari* and granting summary judgment for the CTA on that count of his complaint.

¶ 35                                                    Analysis

¶ 36                                            Writ of *Certiorari*

¶ 37        "A common law writ of *certiorari* is a general method for obtaining circuit court review of administrative actions when the act conferring power on the agency does not expressly adopt the Administrative Review Law [(735 ILCS 5/3-101 *et seq.* (West 1992))] and provides for no other form of review." *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). The standards of review in a writ of *certiorari* action "are essentially the same as those under the Administrative Review Law." *Id.* "[C]ourts generally do not interfere with an agency's discretionary authority unless the exercise of that discretion is arbitrary and capricious [citation] or the agency action is against the manifest weight of the evidence [citation]." *Id.* at 272-73. *Certiorari* review is appropriate because the Metropolitan Transit Authority Act (Transit Act) (70 ILCS 3605/1 *et seq.* (West 2020)), the enabling statute creating the CTA, does not adopt the Administrative Review Law or provide another method of judicial review of a CTA decision.

¶ 38        The purpose of a writ of *certiorari* is to have the entire record brought before the trial court to determine, from the record alone, if the inferior tribunal proceeded according to the applicable law. *Reichert v. Court of Claims*, 203 Ill. 2d 257, 260 (2003). The issuance of the writ is within the trial court's sound discretion. *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 428 (1990). A petition for *certiorari* relief is properly denied when the trial court finds the plaintiff cannot prevail or is not entitled to the review. *Tanner v. Court of Claims*, 256 Ill. App. 3d 1089, 1092 (1994).

¶ 39    Snow contends the trial court should have granted his writ of *certiorari* and denied the CTA's motion for summary judgment. He asserts that under section 9 of the 1990 Plan, in effect when he became a participant, the CTA's determination regarding his "entitlement to, and the value and amount of [his] benefits *** shall be final, binding, and conclusive." So, he reasons, the CTA's determination in 2003 that he was eligible to participate in the Supplemental Plan and its 2005 determination calculating his annuity benefit were final and binding decisions and the Retirement Committee lacked authority to change those determinations later.

¶ 40    For support, Snow relies on *Sharp v. Board of Trustees of the State Employees' Retirement System*, 2014 IL App (4th) 130125. In *Sharp*, the plaintiff sought administrative review after the board of trustees of the SERS decreased his monthly pension benefit 10 months after he retired on discovering a computation error. *Id.* ¶ 1. The trial court reversed the administrative action, finding the SERS board lacked authority to reconsider its earlier pension calculation. *Id.* ¶ 2. The appellate court affirmed, in part, because the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2010)) did not grant the board express authority to correct calculation errors, and the court would not infer that authority from the board's fiduciary duties or audit powers. *Sharp*, 2014 IL App (4th) 130125, ¶ 25.

¶ 41    Snow argues that, as in *Sharp*, we cannot infer the Retirement Committee had the power to reduce his pension benefit absent explicit authority under the Transit Act or the Supplemental Plan, which he contends did not exist. We disagree. Section 8.4 of the Plan expressly gave the Retirement Committee that authority stating, "benefits paid to an Employee under the provisions of this Section 8 shall be reduced to the extent that any such benefits are

provided by the [CTA's] Retirement Plan and any other governmental retirement plans for which the Employee received credit."

¶ 42    We also reject Snow's assertion that the Retirement Committee lacked authority to reduce his pension benefits absent specified rules and regulations. Snow concedes section 5.2 of the 2003 Plan permits the Retirement Committee to pass "rules and regulations" addressing recalculation of benefits post-retirement but argues the Retirement Committee never adopted rules or regulations and has no authority to change his pension benefit unilaterally. Besides rule-making authority, section 5.2 gives the Retirement Committee power "to decide any question arising in the administration, interpretation and application of this Plan." Thus, the Retirement Committee had authority to apply section 8.4 and reduce his CTA pension once it learned Snow had been receiving benefits from another governmental retirement plan for the same years he was receiving credit under the CTA plan.

¶ 43    Snow argues, however, that the plain language of section 8.4 does not permit the Retirement Committee to re-evaluate the employee's eligibility after the employee retires from the CTA. Specifically, he contends that under section 8.4, the CTA could reduce the amount of the employee's annuity benefits under the Supplemental Plan for an employee receiving benefits from another government pension plans used for bridging purposes to obtain benefits under the CTA Plan *at the time of retirement*. But once the employee retires, section 8.4 does not permit the Retirement Committee to reduce benefits. Thus, according to Snow, the Commission can prevent a participant from "double dipping" at retirement, but after retirement the annuity amount is established and the Retirement Committee has no authority to stop the former employee from re-using the bridging years to obtain a pension from another governmental plan.

¶ 44        Snow relies on the phrase in section 8.4 "any other governmental retirement plans for which the Employee *received* credit hereunder." (Emphasis added.) He asserts that on the date he retired from the CTA, he had not yet "received" credit from another government plan for the same years of service he used for bridging purposes under the CTA's plan. Without authority, he asserts that the use of the past tense ("received") precludes the CTA from later reducing or eliminating his pension benefit. Further, even if section 8.4 can be read either way, government pension plans should be construed liberally in the retiree's favor. See *Johnson v. Retirement Board of Policemen's Annuity and Benefit Fund*, 114 Ill. 2d 518, 521 (1986).

¶ 45        A canon of statutory construction states that all provisions of legislation be viewed as a whole, and all words and phrases interpreted in light of other relevant provisions and not in isolation. See *Di Falco v. Board of Trustees of the Firemen's Pension Fund*, 122 Ill. 2d 22, 27 (1988). Words are to be given their plain and ordinary meaning. See, *e.g.*, *Board of Education of the City of Chicago v. Moore*, 2021 IL 125785, ¶ 20. In interpreting a statute, "[t]he court may consider the reason the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Id.* Further, courts "must presume that the legislature did not intend to create absurd, inconvenient, or unjust results." *Lawler v. University of Chicago Medical Center*, 2017 IL 120745, ¶ 12.

¶ 46        Applying these principles, a Plan participant's obligation to avoid double dipping was ongoing. Section 8.4 states, "to the extent any such benefits *are* provided by the [CTA] Retirement Plan and any other governmental plan." (Emphasis added.) Indeed, the Statute on Statutes provides, "[w]ords in the present tense include the future." 5 ILCS 70/1.02 (West 2020). Moreover, Snow acknowledged the CTA's authority to change his pension benefit after retirement. When he decided to retire from the Attorney General's office and seek a pension

under the SERS and the Cook County Fund, he asked the Retirement Committee for an estimate of any change in the amount of his CTA pension.

¶ 47    Alternatively, Snow argues that regardless of whether the CTA had authority to terminate his pension benefits, the Retirement Committee's annuity award was a final agency decision after 35 days, citing section 3-103 of the Administrative Review Law (735 ILCS 5/3-103 (West 2020) ("Every action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected by the decision ***."); see also *Kosakowski v. Board of Trustees of the City of Calumet City Police Pension Fund*, 389 Ill. App. 3d 381 (2009) (board did not have jurisdiction to modify pension more than 35 days after its initial decision, which relied on improper date for final salary amount).

¶ 48    Assuming the Retirement Committee's 2005 decision awarding Snow a pension benefit constituted a final administrative order, the Retirement Committee had continuing authority to administer the Plan and apply Plan provisions, here section 8.4, even if it might result in a change to the 2005 benefits award. *Kaczka v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 398 Ill. App. 3d 702 (2010), is illustrative. In *Kaczka*, the plaintiff began collecting a widower's annuity after his wife, a police officer, died 12 days after marriage. *Id.* at 704. When the plaintiff remarried, the board terminated his benefits under a Pension Code provision eliminating eligibility after remarriage. *Id.* When the legislature amended the Pension Code to provide that a widower's annuity is no longer subject to termination or suspension due to remarriage, the plaintiff applied for reinstatement of his widower's annuity. *Id.* After a hearing, the board denied reinstatement under a then-existing provision of the

Pension Code providing that a widower had " 'no right' " to an annuity " 'if the marriage occurred less than one year prior to the policeman's death.' " *Id.*

¶ 49    On appeal, the plaintiff argued that in refusing to reinstate his benefits, the board improperly modified its 1992 award that became final under the Administrative Review Law after 35 days. *Id.* at 706. The appellate court rejected that argument. In distinguishing *Kosakowski*, the panel stated that "the Board is not seeking to rehear or modify the substance of its original order in which it granted plaintiff a widower's annuity in 1992. Rather, plaintiff's benefits were subsequently suspended by operation of law due to his remarriage" under the Pension Code as it then existed. *Id.* at 707.

¶ 50    Similarly, in terminating Snow's benefit in 2017, the Retirement Committee did not modify its original 2005 order; it applied section 8.4, which prohibits the use of the same years of service for more than one governmental pension and results in termination of Snow's CTA benefits. Because the Retirement Committee had authority to terminate Snow's pension benefits under section 8.4 after determining he had been receiving benefits from two governmental pensions for the same years of service, the trial court did not err in granting summary judgment for the CTA on count I of the amended complaint.

¶ 51                                    Due Process

¶ 52    Snow contends the Retirement Committee was obligated to give him a "full evidentiary hearing" before terminating his benefits. The CTA asserts it satisfied due process by giving Snow adequate notice and an opportunity to be heard, as evidenced by the extensive correspondence between the parties and the post-termination opportunity for reconsideration. Moreover, Snow was not prejudiced by the process where the facts establish that he

acknowledged he was not entitled to CTA retirement benefits without using his bridge of service credits from Cook County, a legal question.

¶ 53    The United States and Illinois Constitutions prohibit the deprivation of life, liberty, and property without due process. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. The Supreme Court has long held that the property interests protected by procedural due process "extend well beyond actual ownership of real estate, chattels, or money." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72 (1972). Protected property interests include those benefits to which a person has "a legitimate claim of entitlement." *Id.* at 577. Pension benefits fall into this category. See Ill. Const. 1970, art. XIII, § 5 ("[m]embership in any pension *** system of the State, any unit of local government ***, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired"); see also *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220, 228-29 (1998); *Miller v. Retirement Board of Policemen's Annuity & Benefit Fund*, 329 Ill. App. 3d 589, 597 (2001) (police officers had constitutionally protected property interest in pension benefits).

¶ 54    Due process requires, at minimum, notice and a meaningful opportunity to be heard. *Colquitt v. Rich Township High School District No. 227*, 298 Ill. App. 3d 856, 863 (1998). In administrative proceedings, the notice does not need to be as precise or detailed as in normal court proceedings (*Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 93 (1992)) but "must be reasonably calculated to apprise interested parties of the contemplated action and to afford the interested parties an opportunity to present their objections" (*East St. Louis Federation of Teachers*, *Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 420 (1997)). While an evidentiary hearing is not required in every circumstance, the administrative proceedings employed must provide

the party affected with a meaningful procedure to assert his or her claim before the deprivation or impairment of a property right. *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976). A court will find a due process violation only if there is a showing of prejudice. *Stratton*, 133 Ill. 2d at 435-36 (holding, issues of procedural due process "did not result in substantial prejudice and therefore cannot be used to establish a denial of procedural due process").

¶ 55    We agree with the CTA that due process does not require "formal notice." But notice must be "reasonably calculated to apprise interested parties of the contemplated action." *East St. Louis Federation of Teachers*, 178 Ill. 2d at 420. When Snow informed the Plan in December 2016 that he was retiring from the Attorney General's office and asked for an estimate of any change in the amount of his CTA annuity, the Plan's attorney advised him he could not collect from another pension plan for service years covered by the CTA's Plan and asked him to "confirm which plan(s) [he] has elected to collect benefits from and the years of service applied so that the CTA can properly respond to your inquiry." When the Plan learned through a FOIA request that the Cook County Fund was paying Snow an annuity benefit based on service credit from the same years Snow used to bridge his service to obtain benefits under the Supplemental Plan, the Plan terminated his pension annuity and his and his family's health care benefits without notice. Despite the correspondence discussing the possible termination of his pension (the correspondence never mentioned health care benefits), once the Plan decided it was terminating those benefits, it was required to give him notice before the contemplated action.

¶ 56    A full evidentiary hearing is not required to satisfy due process, but the interested party must have an opportunity to present objections to the government's action. In deciding whether a party was afforded a meaningful opportunity to be heard, we balance (i) the private interest affected by the official action, (ii) the risk of erroneous deprivation of that interest through the

procedures used and the probable value, if any, of additional or substitute procedural safeguards, and (iii) the government's interests, including the fiscal and administrative burdens that additional or substitute procedural safeguards would entail. *Mathews*, 424 U.S. at 335. As to the first factor, Snow had a significant private economic interest in continuing to receive his pension annuity and healthcare benefits.

¶ 57    The second factor requires assessing the risk of erroneous deprivation of the plaintiff's private interest through the procedure used and the probable value of additional or alternative procedural safeguards if any. See *id.* In *Mathews*, which involved disability benefits, the Court observed that the risk of erroneous deprivation was ameliorated where the "elaborate character" of the predeprivation administrative procedures permitted the claimant to complete a detailed questionnaire regarding his disability status, provided the claimant access to all information on which the agency relied as well as a summary of the reasons for the proposed termination, and allowed the claimant to submit additional evidence or arguments to challenge the accuracy of the information and the correctness of the agency's tentative conclusions. *Id.* at 339-40, 345-46.

¶ 58    In contrast, once the CTA learned from a FOIA request that Snow was using the same years of bridged service for a different plan, it ended his pension and health care benefits without allowing Snow to submit evidence or arguments to refute the accuracy of the information. Nor did the CTA allow Snow to opt to continue receiving benefits under the Supplemental Plan rather than the SERS plan or divide the years of service so he could continue receiving a reduced pension from each Plan, which the CTA acknowledged he could have done.

¶ 59    Moreover, after discontinuing his pension and health care, the CTA's "appeal process" provided an opportunity to submit additional information but *after* terminating his pension

benefits. This was not an adequate substitute for the type of procedural protections in *Mathews*. So, the risk of erroneous deprivation of Snow's pension benefits and the probable value of additional procedural safeguards that a hearing could provide were substantial.

¶ 60    Finally, we consider the interests of the governmental entity, which include the administrative burdens and other societal costs associated with requiring additional procedural safeguards before depriving the private interest. *Id.* at 347. The CTA's interests consist of protecting the fiscal integrity of the pension fund by ensuring that Plan participants do not receive pension benefits they are not entitled to and by limiting the cost and burden of making that determination. Recognizing that a formal, evidentiary hearing is not mandated in all circumstances (*id.* at 348-49; *Wendl v. Moline Police Pension Board*, 96 Ill. App. 3d 482, 487 (1981)), we do not believe that some form of procedure allowing Snow an opportunity to be heard before discontinuing his pension and healthcare benefits would have posed onerous fiscal or administrative burdens.

¶ 61    We affirm the order granting summary judgment on Snow's due process claim.

¶ 62            Damages for Procedural Due Process Violation

¶ 63    The CTA argues that even if we affirm the judgment for Snow on his due process violation claim, we should reverse the award of compensatory damages because Snow suffered no actual damages. Namely, because the trial court found that Snow violated the language of section 8.4 and that it "was perfectly appropriate" for the CTA to terminate his benefits in January 2017, the procedural due process violation in March 2017 did not cause Snow compensatory damages.

¶ 64    As a preliminary matter, Snow contends the CTA waived the argument that the due process violation did not cause him damages by failing to specifically raise it until its motion for

reconsideration. See *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36 ("[a]rguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal") We disagree. In response to Snow's damages calculation, the CTA stated it "maintains its position that all of its actions relating to Snow were authorized by the CTA's Supplemental Retirement Plan *** and that its actions did not violate Snow's due process rights or entitle him to recover any damages pursuant to 42 U.S.C. § 1983. The CTA reserves its right to appeal the Court's March 10 Order" finding that Snow was entitled to damages for the due process violation. This was sufficient to preserve the issue for appeal.

¶ 65        Turning to the merits, we look to federal court decisions for guidance, as this issue involves federal constitutional principles of due process. See *M&T Bank v. Mallinckrodt*, 2015 IL App (2d) 141233, ¶ 51 n.3 ("While cases from lower federal courts are not binding, we may consider them as persuasive authority."). In *Carey v. Piphus*, 435 U.S. 247 (1978), the United States Supreme Court held that students who had been suspended from school for misbehavior, without due process, were not entitled to damages where, had proper procedures been followed, they would have been suspended anyway. The Court agreed with the Court of Appeals for the Seventh Circuit that where the deprivation of a party's property interest is attributable to his or her own conduct rather than a failure to adhere to the requirements of procedural due process, an award of damages would constitute a windfall rather than compensation. *Id.* at 260.

¶ 66        Conversely, where the loss of a governmental benefit is directly attributable to the due process violation, the proper remedy might be to restore the benefit, at least until it is terminated through constitutional procedure. Loss of a governmental benefit is directly attributable to a due process violation when the violation accelerates the loss. In other words,

a due process violation occurs when, because of the improper procedure, the benefit was terminated earlier than it would have been had the recipient's due process rights been honored. See *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 440 (D.D.C. 2005) (and cases cited). In that instance, the recipient deserves restoration of the benefit from the time of termination until "the earliest date the discharge could have taken effect had the proper procedures been followed." *Brewer v. Chauvin*, 938 F.2d 860, 864 (8th Cir. 1991).

¶ 67    For instance, in *City of Chicago v. United States Department of Labor*, 737 F.2d 1466 (7th Cir. 1984), a municipal employee was deprived of due process when he was terminated without proper notice and an opportunity to respond. The Seventh Circuit upheld a finding that, had the city used proper procedures to terminate the employee, he would have remained on the city's payroll through the end of the year. *Id.* at 1468-69, 1474. Accordingly, the employee was entitled to back pay for the period from, his termination date until the end of the year.

> "[A]lthough due process violations do not negate decisions terminating government benefits, the recipient is entitled to be placed in the position he or she would have occupied had the termination procedure been constitutional. Put differently, whether a termination decision is effective turns not on the constitutionality of the determination proceeding, but on the substantive basis for the termination decision." *Key v. Aurora Housing Authority*, 2020 IL App (2d) 190440, ¶ 14.

¶ 68    Snow concedes that without the nearly 20 years of bridged service, he would not have been entitled to a pension benefit under the Plan, as he had worked at the CTA for less than five years. And the trial court found that Snow pension benefits ended as of January 1, 2017, when he began receiving pension benefits under the Cook County Fund. Even if the CTA had held a hearing before terminating his pension, his benefits would have no longer been in effect as of

January 1, 2017. The record establishes that Snow's conduct caused loss of his CTA pension—taking a pension from SERS and the Cook County Fund using the same service years to qualify for the Supplemental Plan—rather than a deprivation of procedural due process. Because Snow did not suffer a loss directly attributable to the due process violation, we must vacate the damages order.

¶ 69                                 Attorney's Fees Award

¶ 70     The CTA asks that we vacate the award of attorney's fees and costs as a prevailing party under 42 U.S.C. § 1988.

¶ 71     Under section 1988 of Title 42, a court may exercise discretion and award reasonable attorney's fees to a prevailing party in an action to enforce section 1983. *Dupuy v. Samuels*, 423 F.3d 714, 719 (7th Cir. 2005). A plaintiff seeking attorney's fees under section 1988 must initially establish that he or she is a prevailing party. *Tampam, Inc. v. Property Tax Appeal Board*, 208 Ill. App. 3d 127, 132 (1991). To be considered a prevailing party under section 1988, a litigant must have "prevailed on the merits of at least some of his claims." *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980) (*per curiam*). At a minimum, the plaintiff needs to demonstrate the resolution of a dispute that changes the legal relationship between the parties—some relief on the merits of his or her claim. *Id,* The question whether a plaintiff meets the statutory definition of a "prevailing party" involves a legal issue and, thus, involves *de novo* review. See *Melton v. Frigidaire*, 346 Ill. App. 3d 331, 334-35 (2004) (whether litigant prevailing party for fee-shifting purposes subject to *de novo* review).

¶ 72     The CTA asserts that even if Snow is a prevailing party on his due process claim, his victory was nominal, "technical" and "*de minimis*," and unworthy of an award of attorney's fees and costs. For support, the CTA relies on *Farrar v. Hobby*, 506 U.S. 103 (1992). In *Farrar*, the

United States Supreme Court addressed the propriety of awarding attorney's fees to a civil rights plaintiff who obtains a judgment for nominal damages. *Id.* at 105. The Court concluded that a civil rights plaintiff who obtains nominal damages is a "prevailing party" under section 1988, but the degree of overall success should be considered a factor in determining the reasonableness of a fee award. *Id.* at 111-15. "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief [citation], the only reasonable fee is usually no fee at all." *Id.* at 115.

¶ 73    Snow was a prevailing party on his due process claim. But, as noted, he suffered nominal damages. In this case, the nominal damages do not justify attorney's fees and costs. So, we vacate that order.

¶ 74    Affirmed in part and reversed in part.

---

*Snow v. Chicago Transit Authority*, 2022 IL App (1st) 201217

---

| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-13494; the Hon. Michael T. Mullen, Judge, presiding. |
|---|---|

---

| **Attorneys for Appellant:** | Ruth F. Masters, of MastersLaw, of Oak Park, for appellant. |
|---|---|

---

| **Attorneys for Appellee:** | Elizabeth M. Bartolucci, of Bartolucci Law, LLC, of Oak Park, for appellee. |
|---|---|

---